UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-10018-CR-MARTINEZ

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FRANCISCO MAUNTECA LOPEZ,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE is before the Court on the defendant's Motion to Suppress (DE 28), which was referred to United States Magistrate Judge, Lurana S. Snow, for report and recommendation. The defendant is charged by indictment with attempted re-entry into the United States after deportation, in violation of 8 U.S.C. § 1326 (a) and (b)(2). He seeks to suppress statements made without <u>Miranda</u> warnings during the United States Coast Guard (USCG) boarding of a vessel he was operating, and to suppress evidence seized from the vessel. The Government responded to the motion (DE 38), and an evidentiary hearing was conducted on January 3, 2012.

**I. EVIDENCE PRESENTED**

USCG Officer Roberto Narvaez testified that he is a Marine Officer Specialist, Second Class, with duties including training officers of the Coast Guard and other agencies, and serving as a boarding officer and Spanish interpreter. He has been with the USCG for fifteen years, has been stationed in Florida for the past seven years and has participated in 1,742 boardings.

Officer Narvaez recited the standard questions which are posed to the captain or master of a vessel on all boardings: (1) Do you have any weapons on board? (2)What was your last port of call? (3) What is your next port of call? (4) Of what country are you a citizen? (5) How

many people are on board?  (6) What was the purpose of your voyage?  (7) Was the voyage successful or did you experience problems?  After obtaining answers to these questions, the boarding officer then checks the vessel documents, including registration, so that it can be determined whether the vessel has been stolen.  Next, an Initial Safety Inspection is conducted, where the boarding team checks for fire, flooding and electrical or structural hazards.  Finally, the team ascertains whether the required safety equipment is on board.

On October 1, 2011, Officer Narvaez was on temporary assignment to the USCG Cutter *Seneca*, with a home port of Boston, Massachusetts, on routine patrol in international waters between Key West, Florida and Cuba.  He was part of a specialized "non-compliant" boarding team, consisting of USCG officers with advanced training and experience in boarding vessels involved in drug smuggling, human trafficking and other criminal violations.  At approximately 11:50 a.m, a boarding team was assembled to intercept a vessel that had been observed entering Cuban seas and had been moving erratically.  The only information about the vessel was that it was a low-profile fast boat, and nothing was known about the persons on board.  The captain of the *Seneca* instructed the boarding team to head out to the vessel's location (without entering Cuban waters), intercept the vessel and ascertain the nationality of the vessel and the identity of any persons on board.

Officer Narvaez and the members of the team boarded a small boat called an "over the horizon" or "OTH."  The OTH was clearly identified as belonging to the USCG, as was the clothing worn by members of the five-person boarding party.  Traveling at approximately 40 knots, it took them about two hours to reach the vessel, which was close to the coast of Cuba and in sight of Cuban land. When Officer Narvaez first sighted the vessel,  he could see that it was white, but could not tell for sure how many people were on board.  As the OTH got within 200 yards of the vessel, Officer Narvaez determined that there were two people on board and they had seen the OTH.  Based on the intercept course that had been taken, the USCG markings on the OTH would have been visible to the persons on the vessel.

As the OTH approached, Officer Narvaez used a loud hailer to call, "U.S. Coast Guard, stop your vessel," twice in English. When nothing happened, he called out the same words in Spanish. After the second time in Spanish, the vessel began to slow down. It was being operated by the defendant. Prior to boarding, Officer Narvaez instructed the two men on board to put their hands up and asked if they had any weapons on board. Both men complied and stated that they had no weapons. Officer Narvaez told them to move to the port side of the vessel, and then he and Officer Dennis Ordyna boarded. Both officers were armed, but neither had drawn his weapon.

Once on board, Officer Narvaez addressed both men in Spanish. He asked to see their identification, which they produced. He then asked for their last port of call, and the defendant responded that it was the Miami/Homestead area. The officer asked for the next port of call, and the defendant responded Key West. Officer Narvaez then asked the purpose of the trip, and the defendant replied that they had been fishing. The officer observed that the only fishing equipment on board were some old fishing poles which appeared to have been unused for a few months. In response to a question about when they left Key West, the defendant stated that it was two days prior. When asked where he had been for the past two days, the defendant also stated that he had come from "back there," indicating the land behind him. Officer Narvaez verified that the defendant was pointing to Cuba. At that time, the defendant also stated that he had been arrested in the past for smuggling aliens.

Officer Narvaez observed a number of items in plain view on the vessel, including a large number of fuel barrels; night vision goggles, which were not normally used by civilians; a global positioning system device (GPS); outboard engines, and a transom area that appeared to have been altered. After asking the standard "pre-boarding" questions, Officers Narvaez and Ordyna first went to the cuddy cabin area to check for flooding. The doorway was obstructed by 50-gallon fuel drums, which was a safety violation. Also in that area was a "hook and climb" ladder, a type not usually found on vessels, which is used for hasty boarding.

Officer Narvaez next checked the engine area. Upon lifting the transom, he found six to eight fuel drums, all completely full. The officer asked the defendant why he needed so much fuel. The defendant responded that the boat used a lot of gas, but Officer Narvaez knew that the fuel on board was far more than was needed for the engines' size. In the center console, there were three more 15-gallon fuel drums. Fuel drums also were found in the compartment on the port side of the vessel where the two subjects were standing, with more on the other side. Based on the total quantity of fuel, Officer Narvaez believed the vessel was a "floating bomb."

The officer also noticed wires hanging off the engine plate, and asked the defendant if he had been having mechanical problems. The defendant replied that he had. When asked who owned the vessel, the defendant stated that it belonged to a friend whom he had known for about seven years, but he did not know the man's name. However, the officer found the owner's name on the vessel's registration.

Officer Narvaez testified that he and Officer Ordyna stayed on the vessel for about three hours because they had to wait for the arrival of the *Seneca*, which traveled at a much slower rate of speed than the OTH. He explained that they needed better communication capability, boarding forms and a camera to photograph the safety violations. Ultimately, the defendant was not cited for any safety violation, but was issued a warning for entering Cuban territorial waters. Officer Narvaez stated that he never intended to arrest the defendant for entering Cuban waters. The defendant was neither placed under arrest nor told he was under arrest, and was not restrained in any way. He was able to move about the vessel and had access to food and water. Officer Narvaez' weapon was never drawn. Although Officer Narvaez eventually learned that Customs and Border Protection (CBP) was interested in the defendant's vessel, but he did not believe that the defendant was going to be arrested. However, the officer did believe that the vessel had been outfitted for smuggling, based on the extra fuel, the night vision goggles, the hook and climb ladder, the

4

defendant's statement that he had been in Cuban waters and the defendant's prior arrest for smuggling Cubans.

On cross examination by counsel for the defendant, Officer Narvaez testified that he is a native of El Paso, Texas and speaks Spanish fluently. He did not know whether the defendant's vessel had been under law enforcement surveillance prior to sighting by the Coast Guard. The decision to intercept the vessel was based on its entry into Cuban waters, and the Coast Guard also wanted to ascertain how many vessels were in the area. Once the vessel was intercepted, it was necessary to find out the vessel's home port and the nationality of those on board.

Officer Narvaez stated that as the radio operator, he was the only member of the boarding team who was in direct communication with the *Seneca*. He radioed to the cutter the information contained in the vessel's documents, and the name of the vessel, which was the *Gatina Maria*. Fifteen or twenty minutes later, the officer was instructed to ascertain if the operator was the vessel owner or if the owner was on board.

Officer Narvaez acknowledged that the defendant was never told that he was free to go. The defendant was advised that the officers would remain on board because of the fuel hazard. Also, the vessel did not appear to be operational. Officer Narvaez was not planning to seize the vessel; it was towed by another cutter because they were headed back to port.

Officer Narvaez explained that the *Gatina Maria* had been running on only one of the twin engines. The area around the key had been popped off, which prompted him to ask if there had been engine trouble. The officer stated that after he provided the names of the two men to the *Seneca,* he received no further instructions. He did not know who made the decision to bring the vessel and its occupants to Key West. Officer Narvaez believed that the defendant could have gone on his own, but Coast Guard personnel were obliged to stay on board because of the hazard posed by the extra fuel, which converted the vessel into something akin to a loaded gun. Officer Narvaez added that he would have brought the vessel into port based solely on the amount of fuel on board.

Eventually Officer Narvaez learned that the vessel would be towed by another cutter, the *Sawfish*. A small boat from the *Sawfish* arrived with another boarding party. For safety reasons, they decided to take the defendant off the *Gatina Maria*. Officer Narvaez was informed that the vessel would be taken to Key West. The defendant asked the officer when he would be allowed to continue his voyage, and Officer Narvaez responded that he could do so as soon as the fuel was removed. The defendant wanted to know if he could continue after they reached land, and Officer Narvaez replied that his only concern was the fuel, which could not be removed while they were at sea.

Officer Narvaez conceded that he knew there was a safety problem as soon as he saw the fuel, and it was not necessary to ask the defendant why he needed that much fuel in order to determine if there was a safety violation. However, at the time of that discussion, Officer Narvaez had no knowledge of CBP's interest in the vessel, he only knew that the vessel was to be towed. He did not learn of CBP's interest until the boarding party from the *Sawfish* arrived.

Officer Narvaez testified that the night vision goggles were located next to the piloting console and were not tied down. The hook and climb ladder was in plain sight on top of the fuel drum at the entrance to the cabin. The officer stated that he was never instructed to administer <u>Miranda</u> warnings to the defendant and he did not do so.

In response to question posed by the Court, Officer Narvaez testified that the vessel's name was on the stern and that no flag was flown. However, the Florida registration numbers were displayed and Officer Narvaez observed them prior to boarding the vessel.

On redirect examination, Officer Narvaez stated that he learned about CBP's interest in the vessel during the last two minutes of the boarding process. He also stated that he observed that the defendant did understand some English.

USCG Petty Officer Dennis Ordyna testified that he has been with the Coast Guard for eleven years. He is assigned to the *Seneca* and serves as a mechanic and boarding officer. He

has been a boarding officer since 2003. On October 1, 2011, Officer Ordyna learned that a Coast Guard fixed wing aircraft had spotted a vessel that was heading northbound. The vessel was going at a high rate of speed in a known smuggling area, A decision was made to intercept the vessel, and Officer Ordyna was to be the boarding officer, with Officer Narvaez serving as the assistant boarding officer. The OTH was launched and Officer Ordyna and the other members of the boarding party began a pursuit, which lasted for more than an hour. He explained that in USCG terminology, "pursuit" means traveling as fast as possible in a straight line to stop a vessel.

Officer Ordyna stated that the vessel was spotted in the high seas, with land visible in the distance. Later the officer learned that the land was Cuba. He described the vessel as a 25' boat with an open construction bow and a cuddy cabin. It was white with a red stripe with twin outboards. The vessel's name was *Gatina Maria*, registered in Florida, with a home port of Homestead, Florida. Officer Ordyna saw the FL numbers on the side of the boat before he boarded.

Officer Ordyna stated that at the time of boarding he was armed, but his weapon was not drawn. The engines of the *Gatina Maria* had been turned off for the safety of the boarding team. Officer Ordyna directed Officer Narvaez to ask questions in Spanish of the defendant, who was the captain of the vessel. The defendant first was asked if there were any weapons on board. He was asked for his last and next port of call. The defendant initially indicated Key West, Key West then changed his answers to Homestead, Key West. Both men on board produced their driver's licenses. The defendant spoke in English on occasion, other answers were given in Spanish.

After the initial "pre-boarding" questions, Officer Ordyna observed on board some coolers, fishing rods, a GPS and a PVC apparatus that appeared to be a ladder. The ladder was propped up by fuel drums. Officer Ordyna instructed Officer Narvaez to ask the defendant what the ladder and the fuel barrels were for, and why the defendant was in the area. While Officer Ordyna was communicating the defendant's name over the radio to the *Seneca*, the defendant told Officer Narvaez that he had been arrested in the past for running migrants.

Officer Ordyna then began the initial safety inspection (ISI) to check for fire and flooding. He proceeded to check the vessel from the bow to the stern. Near the open center column, he moved four fuel barrels and looked inside the cuddy cabin, which was very clean. He then opened the engine hatch covers and discovered more than ten cans of gasoline. There were additional fuel cans on the other side of the boat. After the ISI was completed, the officers then checked for the required safety equipment, which the defendant produced. There were no items missing and the only concern was the excess fuel.

Officer Ordyna testified that he received no instructions from the *Seneca* regarding what to do with the defendant and the boat. It was not until the *Sawfish* arrived that he learned that the two men and the vessel would be transferred to the *Sawfish*. The officer did not learn anything about CBP's interest in the vessel until the very end of the boarding process.

Officer Ordyna stated that he was on board the *Gatina Maria* for several hours because the *Seneca* is very slow and took a couple of hours to arrive. He explained that they waited for the *Seneca* because the boarding party needed protection, since there were no other boats in the area. Also, the defendant had admitted that he had entered Cuban territory and they were going to issue a notice of entering foreign waters. The boarding party did not have with them the appropriate form.

Officer Ordyna testified that the defendant was never placed under arrest or told he would be arrested. He was not handcuffed and was free to walk around the boat and to get food and drinks from the coolers.

On cross examination, Officer Ordyna testified that he is certain that neither the *Seneca* nor the OTH ever entered Cuban waters. He stated that during the briefing he received aboard the *Seneca*, he was told only that a fixed wing aircraft had spotted a white vessel heading northbound at a high rate of speed. While in the OTH, the officer first spotted the *Gatina Maria* on

radar. His first visual sighting was when the vessel was less than two miles away. It was heading from his left to his right. There were no other vessels in the area.

Officer Ordyna stated that all five members of the boarding team were armed and that only Officer Narvaez spoke Spanish. He and Officer Narvaez boarded the *Gatina Maria* and the other three officers remained on the OTH. The OTH approach speed was about 40 knots, while the *Gatina Maria* was traveling at about 15 knots. When the officers first boarded, he could see the fuel barrels, but could not determine if all of them were full.

Officer Ordyna acknowledged that he instructed Officer Narvaez to inquire of the defendant about the fuel and ladder and about the fishing equipment. One of the pre-boarding questions was about the purpose of the trip, which the defendant had stated was fishing. Officer Ordyna observed that there were only two fishing rods, and that were no lures, tackle or hooks on the rods. Additionally, there was no ice, and the vessel was traveling too fast for fishing in a location that was not a known fishing area. The defendant stated that he was able to fish with what he had.

Officer Ordyna testified that the defendant also stated that he was having engine trouble, operating with only one engine. While the defendant was working on the engine, he lost track of time and drifted close to the shore of Cuba, in sight of land. The defendant admitted knowing he had entered Cuban waters. However, the officer noted that the vessel had been traveling at high speed with two engines, and that both engines operated when the boat headed back to Key West.

Officer Ordyna stated that after the safety inspection was completed, they were in a holding pattern, waiting to hear whether any action would be taken as the result of the defendant's entry into Cuban waters. During that time, the defendant was not free to leave. Eventually Officer Ordyna learned that the defendant was to be cited. A form 6310 was completed which was read to the defendant and he was asked to sign it. The officer did not know what the defendant was required

9

to do as a result of the citation or whether he was required to appear in court. The defendant was photographed to document that he had signed the form.

On redirect examination, Officer Ordyna stated that the defendant was not free to leave until the entire boarding process was completed. He added that this is true in every Coast Guard boarding.

Officer Narvaez was recalled to provide additional testimony. He stated that he observed cellular telephones and a satellite telephone in plain view in a clear plexiglass compartment near the piloting station.

Homeland Security Special Agent Daniel Richichi testified that he is the case agent on this case. He was notified that a vessel had been seized and that the master of the vessel had a history of alien smuggling. The agent was informed of the observations made by the USCG boarding team, which in his experience indicated that the vessel had been engaged in an alien smuggling venture. He learned that CBP had decided to bring the vessel in for possible forfeiture.

Agent Richichi stated that the vessel arrived in port during the early morning hours of October 2, 2011. At that time, CBP took custody of the vessel and detained it . Agent Richichi observed CBP officers search the vessel and bring out a cellular telephone, a satellite telephone a night vision scope and a GPS. The agent seized these items and entered them in evidence.

## II. RECOMMENDATIONS OF LAW

At the conclusion of the hearing, counsel for the defendant conceded that the Coast Guard had authority to board the vessel to conduct a document and safety inspection pursuant to 14 U.S.C. § 89a. Counsel argued, however, that the questioning of the defendant constituted custodial interrogation and that <u>Miranda</u> warnings should have been administered, particularly before the officers asked about the fishing equipment and where the defendant had been during the course of his trip. Based on the <u>Miranda</u> violation, the defendant's statements should be suppressed. The

defendant also seeks suppression of the physical evidence on the ground that it was not discovered during the course of a routine safety and document check.

The Government contends that the defendant has not met his burden of demonstrating standing to contest the search of the vessel. The Government also argues that questioning by the Coast Guard during the course of a document and safety inspection is not custodial interrogation and no Miranda warnings were required.

**A. Items Seized from the Vessel**

The undersigned finds that the defendant, who was not the owner of the vessel, did not have a legitimate expectation of privacy in the areas searched by the Coast Guard. *See*, United States v. Morales, 889 F.2d 1058 (11th Cir. 1989) (crew members did not have a legitimate expectation of privacy in the main berthing compartment of a vessel searched by the Coast Guard during a safety and documentation inspection). Additionally, the items which the Government may seek to introduce into evidence (the night vision scope, GPS, cellular telephone and satellite telephone) were seized pursuant to a search by CPB after the vessel had been seized for possible forfeiture. Therefore, the defendant lacks standing to contest the search.

Even if the defendant had standing, the items seized were in plain view on the deck area of the vessel. The night vision scope and GPS were in the piloting console area and the telephones were nearby in a compartment covered in clear plexiglass. Since the defendant concedes that the Coast Guard was entitled to board the vessel (which was registered in Florida and subject to the jurisdiction of the United States), the items could be seized under the plain view doctrine.

**B. Statements of The Defendant**

The parties agree that a suspect is "in custody" for Miranda purposes if it is "evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such an extent that he would not feel free to leave." United States v. Phillips, 812 F.2d

11

1355, 1360 (11th Cir. 1987) (quoting <u>Minnesota v. Murphy</u>, 465 U.S. 420, 430 (1984)).  The Eleventh Circuit "has long recognized that the Coast Guard's routine stop, boarding and inspection of an American vessel on the high seas does not normally rise to the level of custodial detention thus requiring *Miranda* warnings." <u>United States v. Rioseco</u>, 845 F.2d 299, 302-03 (11th Cir. 1988) (citing <u>United States v. Jonas</u>, 639 F.2d 200, 204 (5th Cir. Unit B 1981); <u>United States v. Gray</u>, 659 F.2d 1296 (5th Cir. Unit B 1981)).

In <u>Rioseco</u>, the court held that the defendant was not "in custody" during a Coast Guard routine boarding, despite the fact that the boarding officers were armed and the defendants were gathered in the fantail of the vessel, because the "Coast Guard action was simply routine procedure during a usual boarding action," and a their conduct could not lead a reasonable man to believe that he was in custody. <u>Rioseco</u>, 845 F.2d at 303. The court emphasized that the boarding officer testified that at no time during the initial stop did he intend to hold the defendant for criminal prosecution under the Lacey Act, the statute for which the defendant ultimately was charged with violating.

In <u>United States v. Clark</u>, 664 F.2d 1174 (11th Cir. 1981), the defendant challenged the Coast Guard's questions regarding where he had come from, where he was going and what was in the ship's cabin, posed to him prior to conducting a routine safety and documentation check. The defendant asserted that his answers to those questions should have been suppressed because <u>Miranda</u> warnings had not been administered. The court rejected the defendant's argument, noting that "Fifth Circuit decisions have squarely held that the routine stop, boarding and inspection of an American vessel on the high seas by the Coast Guard does not in itself create a 'custodial' situation that triggers the need for Miranda warnings," and that the defendant "has failed to establish the existence of any special circumstances that would render the preboarding conversation a custodial interrogation for Miranda purposes." <u>Clark</u>, 664 F.2d at 1176 (citations omitted).

The four factors which must weighed to determine whether "an initially routine boarding and safety inspection has metamorphosed into a custodial interrogation at the time of questioning" are set forth in United States v. Magdaniel-Mora, 746 F.2d 715, 723 (11th Cir. 1984):

> (1) whether probable cause to arrest the defendant had arisen; (2) whether the interrogating officer subjectively intended a detention beyond that needed for a routine stop and search; (3) whether the defendant subjectively believed that his freedom was restricted so beyond the customary that he was imminently subject to arrest; and (4) whether the investigation had become accusatory and focused on the defendant. (citation omitted)

In the instant case, the answer provided by the defendant which gave rise to the charge against him came during the initial pre-boarding questioning, when he stated that he was headed to Key West.  Clearly there is no basis for a finding that the defendant was "in custody" at that point, since the question regarding next port of call is posed by the Coast Guard during every routine inspection.  The issue, then, is whether Miranda warnings were required prior to questions dealing with the purpose of the defendant's trip, the need for extra fuel and the ladder, and where the defendant had been during the trip.

The undersigned finds that each of the four factors listed in Magdaniel-Mora supports a finding that the defendant was not in custody at any time during the boarding process.  Although the Coast Guard Officers suspected that the defendant was involved in an alien smuggling venture, there was no probable cause to arrest him and neither of the boarding officers subjectively intended a detention beyond that needed for a routine stop and search.  The defendant did not subjectively believe that his freedom was so restricted so beyond the customary that he was imminently subject to arrest, since he asked Officer Narvaez when he would be permitted to continue with his trip, and was told he could do so when the dangerous fuel had been removed.  Finally, the investigation had not become accusatory and focused on the defendant, since the officers merely gave the defendant a warning for entering foreign waters.

The undersigned finds that no action was taken and no question was posed by either of the boarding officers that was outside the scope of a routine inspection for documentation and safety. Therefore, the undersigned concludes that the defendants was not "in custody" at any time during the boarding process and Miranda warnings were not required prior to any of the questions posed by the Coast Guard Officers. Clark, 664 F.2d at 1176.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that defendant **Francisco Maunteca Lopez'** Motion to Suppress (DE28) be DENIED.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 6th day of January, 2012.

/s/ Lurana S. Snow
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record